**In re Jenny RIVERA, Debtor.**

**No. 01–42625(MS).**

United States Bankruptcy Court, D. New Jersey.

May 25, 2006.

Patrick D. Tobia, Esq., Clemente, Mueller & Tobia, PA, Morristown, NJ, for Shapiro & Diaz, LLP.

Kevin H. Marino, Esq., Marino & Associates, PC, Newark, NJ, for Rhondi Lynn Schwartz, Esq.

Peter N. Gilbreth, Esq., Morristown, NJ, for Nelson Diaz, Esq.

Vincent F. Papalia, Esq., Colin R. Robinson, Esq., Saiber, Schlesinger, Satz & Goldstein, LLC, Newark, NJ, for EverHome Mortgage Company f/k/a Alliance Mortgage Corp.

Rhondi L. Schwartz, Shapiro & Diaz, LLP, Marlton, NJ, for Alliance Mortgage Corporation.

Michaelene Loughlin, Esq., Loughlin and Latimer, Hackensack, NJ, for Jenny Rivera.

Stephen M. Orlofsky, Esq., Blank Rome LLP, Cherry Hill, NJ, Raymond M. Patella, Esq., Blank Rome LLP, Philadelphia, PA, for First American National Default Outsourcing, LLC.

Natasha M. Songonuga, Esq., Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Dan Schmidt.

Thomas C. McCoy, Esq., Woodland, McCoy & Shinn, LLC, Manahawkin, NJ, for Linda Hynes, Esq.

Marie–Ann Greenberg, Esq., Douglas J. McDonough, Esq., Fairfield, NJ, Chapter 13 Standing Trustee.

Michael A. Artis, Robert J. Schneider, Martha R. Hildebrandt, Dept. of Justice, Newark, NJ, for U.S. Trustees Office.

## OPINION

MORRIS STERN, Bankruptcy Judge.

The court, *sua sponte*, ordered a secured party and its counsel to explain certain anomalies related to the execution of certifications, including a certification which would support stay relief to allow foreclosure to proceed against Jenny Rivera's residence in Lodi, New Jersey. These parties were to show cause why sanctions should not be imposed if the court's suspicions were to be borne out. In fact, the court's inquiry has exposed a long-standing and regularized practice of creating documents purported to be "certifications"; however, presigned forms were kept on file by counsel and simply, in case after case, attached to the body of data-laden mortgage default accountings, the composite being filed with the court as if they were certifications.

It is now clear that the respondent law firm, Shapiro & Diaz, LLP ("S & D"), had for an extended period engaged in the practice of preparing certifications in support of bankruptcy stay relief motions and applications, knowingly attaching presigned statements of certification. The actual signatories to the "on-file" forms were in many instances not the client-providers of the information contained in the certifications as submitted, nor did those signatories (whether or not the information providers) actually review the final form of the certifications before the documents were filed with this court. In fact, in the immediate matter which sparked the

court's interest, the "signatory" (one "Amirah Shahied") had not been in the employ of anyone related to the client-secured party for over a year before the certification was filed. Moreover, in that period when no relevant client relationship existed with Amirah Shahied, her warehoused statement of certification was appended to the tail end of accountings of default in mortgage payments and filed with this court by S & D approximately 250 times.

S & D is part of a national network of law firms owned or controlled by two Illinois attorneys, Gerald M. Shapiro and David Kreisman. Shapiro and Kreisman had, until June or so of 2004, operated a mortgage loan default outsourcing service ("LOGS Financial Services, Inc."), which interfaced with either mortgage holders or other servicers to process real estate foreclosures and related bankruptcy matters. (LOGS sold its business to "FANDO"[1] in or about June 2004.) Thus, in many instances S & D and other network law firms actually received (and continue to receive) data for foreclosure and bankruptcy motions or applications from such post-default servicers,[2] rather than from mortgagees or primary mortgage loan servicers.

The accounting data from mortgagees' books and records is fundamental to any of their demands for post-default remedies. Secured parties must program their bookkeeping machinery to account accurately for the complexity of home mortgage variables, including not only periodic payments by mortgagors, but also such items as changes in interest rates where applicable, escrow balances, adjusted e.g., for real estate tax and casualty insurance premium payments, and allowable charges for fees and costs. Adding to the mixture is the now routine wholesale transfer of mortgage "paper," bundled as collateral for large debt security issues. National enterprises have developed to service mortgage holders' needs, these servicers often operating in tandem or tiers with subservicers such as FANDO, now specializing in post-default processing. The ostensible "mortgagee" thus changes its identity (sometimes frequently, depending on shifting service arrangements), while mortgagors remain obligated to make periodic payments. Default in payment implicates the foreclosure process, which in turn sets in motion the mortgagor-debtor's efforts to save the homestead, often by seeking recourse to Chapter 13 of the Bankruptcy Code.[3] Chapter 13 plans propose to satisfy mortgage arrears (paid to a standing trustee "within" the plan), while the debtor is required to make regular post-petition mortgage payments (generally paid to the secured party directly, i.e., "outside" the plan).

Accounting for *post-petition* mortgage payments then becomes another layer in secured parties' programming matrices. Debtors, obviously hard-pressed financially and frequently disorganized in their bookkeeping, undertake plan payments which

---

1. FANDO, or First American National Default Outsourcing, LLC, is a subsidiary or affiliate of The First American Corporation.

2. It appears as though, at least currently, mortgage holders or their primary servicers (as distinguished from their default subservicers) select the local attorneys.

3. Chapter 7 cases can also be employed by debtor-mortgagors to save the residence, depending on the equity in the residence and other factors; however, Chapter 13 is the program specifically designed by Congress to preserve home ownership. *See* 11 U.S.C. § 1322(b)(2) and (5); *Nobelman v. Am. Sav. Bank,* 508 U.S. 324, 332, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (concurring opinion); *Grubbs v. Houston First Am. Sav. Ass'n,* 730 F.2d 236, 244–46 (5th Cir.1984).

could stretch out for up to sixty months. Post-petition (indeed, often after Chapter 13 plan confirmation) defaults are bound to develop. Bargains are then struck which give the debtors yet another chance to save their homes, though default provisions are "tightened." The frequently used "cure" order grants a secured party the right to future stay relief on an *ex parte* (but noticed) application of counsel, accompanied by a certification accounting for the latest default.[4] The required "certification," in form and nomenclature, is derived from the New Jersey practice (*see* New Jersey Rules of Court 1:4–4(b)), "Certifications in Lieu of Oath," and is the equivalent of the 28 U.S.C. § 1746 "Unsworn Declaration."

Of course, at any point in Chapter 13 cases disputes can arise between secured parties and debtors over mortgage payments—frequently with debtors swearing payments were made and secured parties swearing payments were not received. Disputes centering on post-petition payment histories are particularly nettlesome. These payment histories—detailing not simply the "regular" mortgage payment credits but also adjusting for direct cure payments and frequently bargained for add-ons to plan payments (plan payments thus including the initial prepetition arrears amount plus the later-accruing post-petition arrears), as well as escrow and other suspense account accounting—are often the bane of a bankruptcy judge's

---

4. In this district *certifications are required* in support of both motions for relief from stay and *"ex parte"* applications for relief following entry of a cure order. D.N.J. LBR 4001–1 which supplements *Fed. R. Bankr.P.* 4001 with respect to applications for relief from the automatic stay provides in relevant part:

In addition to the requirements of **D.N.J. LBR 9013–1** through **D.N.J. LBR 9013–3**, every motion for relief from the automatic stay *shall be accompanied by a certification or affidavit* and supporting exhibits which shall contain the following: ....

D.N.J. LBR 4001–1(c) (italics added, bold emphasis in original). D.N.J. LBR 4001–1(c)(3) then provides:

In chapter 13 cases in which the relief sought is based upon a mortgagee's claim that the debtor has failed to make all postpetition payments due under the terms of the mortgage in issue, the movant shall attach to its *certification* in support of its notice of motion **Local Form No. 16** ("Post-Petition Payment History").

(Italics added, bold emphasis in original.) Specifically, as to non-motion based applications, the starting point is the cure order. *See* the local recommended form of order entitled *Order Resolving Motion to Vacate Stay and/or Motion to Dismiss with Conditions*, enabling the creditor to enforce this Order by certification of default without a hearing (unless there be an objection). The local form order (¶ 4) provides:

If the Debtor fails to make the immediate payment specified above or fails to make any regular monthly payment or the additional monthly cure payment within thirty (30) days of the date the payments are due, then the Secured Creditor may obtain an Order Vacating the Automatic Stay as to the Collateral by filing, with the Bankruptcy Court, a *Certification* specifying the Debtor's failure to comply with this Order.

(Emphasis added.) (*See* public website, United States Bankruptcy Court, District of New Jersey, *www.njb.uscourts.gov,* "Forms," "Recommended Forms and Orders," *Order Resolving Motion to Vacate Stay and/or Motion to Dismiss with Conditions.*)

The local recommended form of certification entitled *Creditor's Certification of Default* is thus premised upon a prior cure order (¶ 2). The instructions to *Creditor's Certification of Default* state in relevant part:

The *Certification shall be completed and signed by an employee of the creditor who has personal knowledge of the facts contained therein.* A copy of the Order providing for the curing of post-petition arrearages must be attached to the Certification....

(Emphasis added.) (*See* public website, United States Bankruptcy Court, District of New Jersey, *www.njb.uscourts.gov,* "Forms," "Recommended Forms and Orders," for both *Creditor's Certification of Default* and the instructions for using it.)

existence on a busy "Chapter 13 day." Anyone who has experienced such accounting conflicts knows the hell of bookkeeping intricacies.

From the court's perspective, the stay relief process involves a high volume of motions and applications, is fast paced, and is best managed by an electronic filing system which has come of age in bankruptcy. Yet, notwithstanding the volume, pace and electronic systemizing of stay relief motions and applications, this court must remain mindful of the serious stakes— most often it is the family homestead that is in jeopardy.[5] Mortgage funding markets should not be roiled by unreasonable impediments to post-default remedies. However, both the data supplied *and the verification processes* employed by those who would foreclose on residences must be above reproach.

In the immediate case (and in many cases participated in by S & D, FANDO and its predecessor, LOGS, and other mortgage holders and servicers), there were serious flaws in those processes.

### Ms. Rivera's Chapter 13 Case.

On November 16, 2001 Jenny Rivera (the "Debtor"), through her counsel, Michaelene Loughlin, Esq., filed a bankruptcy petition and plan pursuant to Chapter 13 of the Bankruptcy Code. The Debtor listed herself as joint owner with a one-half interest in her Lodi residence. She assigned a value of $82,500, apparently to her interest, with the entire property encumbered by a mortgage of $133,781 to Alliance Mortgage.[6] In her plan the Debtor acknowledged $16,000 in prepetition arrears due on the mortgage.

On October 11, 2002 the mortgagee, through S & D, moved for relief from the bankruptcy stay to pursue foreclosure (Docket entry 9). It was contended that the Debtor had failed to make post-petition payments to the mortgagee for May 2002 and thereafter in the amount of $1,476.26 per month. The text of the supporting certification indicated that a final judgment of foreclosure had been entered against the property on an unstated date. Hearing on the motion was scheduled for November 25, 2002, but was adjourned a number of times. Meanwhile, the Debtor's plan was confirmed by order of November 21, 2002. That order acknowledged the Debtor's payments to the trustee ("inside" the plan) over the first eleven months of the plan, required additional trustee payments for the remaining forty-nine months of the plan, and provided for the ultimate cure of the $16,000 mortgage arrearage and a dividend of $3,398 to general unsecured creditors. Nevertheless, at a hearing on February 11, 2003, the court granted the mortgagee's motion for relief from the stay based upon Ms. Rivera's default in payment "outside" the plan.

The Debtor then moved to have the stay reimposed; included as a basis for the motion was Ms. Rivera's allegation that some payments were made by her but returned by the mortgagee, while other payments were automatically deducted

---

**5.** It is not uncommon to have debtors whose homes are at risk appear *pro se.*

**6.** The mortgage documents attached to the mortgagee's motion for relief from stay filed on October 11, 2002 indicate that a loan on September 12, 1997 was given to Antonio Sanchez, Jenny Rivera and Edwin Negron (Docket entry 9). Antonio Sanchez filed a petition in bankruptcy under Chapter 7 on November 20, 2001, listing himself as joint

owner on the property. By order of March 12, 2002, Mr. Sanchez's case was dismissed on the motion of the Chapter 7 trustee. In that case the secured creditor, represented by S & D, obtained an order on April 1, 2002 vacating the automatic stay with respect to the Lodi property (Case No. 01–42656, Docket entry 15). Mr. Sanchez's case was closed on June 11, 2002.

from her bank account and, she presumed, tendered by her bank to the mortgagee. After considerable delay, the Debtor and mortgagee appear to have reached an agreement. On June 1, 2004, the court entered an Order Reinstating the Automatic Stay (Docket entry 29). This "cure" order vacated the February 11, 2003 order which lifted the stay; declared that the Debtor was delinquent for May 2003 through January 2004 for mortgage payments outside the plan, for a total of $12,251.78 in post-petition arrears; required the Debtor to remit a lump sum payment of $4,347 immediately; and provided that the balance of $7,904.78 plus $325 in "bankruptcy fees and costs," a total of $8,229.78, be rolled into the plan. The Debtor was required to contact the Chapter 13 Standing Trustee to fix the new monthly plan payment. As is common in such cure orders, provision was made for default; that is, if the Debtor failed to make any required plan payment or any regular mortgage payment going forward within thirty days of its due date, the mortgagee was granted leave to file a *Certification of Non-receipt of Payment* on notice to the Debtor, Debtor's attorney and trustee, after which the court could, if not hearing an objection, enter an order lifting the stay without further notice to the parties-in-interest.[7]

That brings matters forward to the immediate episode. On August 16, 2005 the mortgagee (now named "EverHome Mortgage Company") filed a document purporting to be a Certification of Default execut-

ed by Amirah Shahied (Docket entry 34). Also included (but not referred to therein or otherwise certified) was Local Form No. 16, which reported payments received on and after February 24, 2004 (but not, as required, accounting for all of the Debtor's payments from the beginning of the case). The certification itself consisted of two pages. Page one's introductory line recited "The undersigned, being Amirah Shahied, certifies as follows." There followed five numbered paragraphs, *inter alia* setting forth the total arrears as $15,229 for mortgage payments and late charges due for November 1, 2004 through August 1, 2005 (minus a small suspense account credit). The second page was a sparse certificate of three typewritten lines, bearing, inexplicably, a paragraph numbered "8," the signature "Amirah Shahied," a blank date line, and, across the top, a facsimile transmission header dated "12/24/03." A certification of service and a proposed form of order accompanied this application.

On August 30, 2005 the Debtor filed a certification in opposition to the creditor's certification of default; in summary Ms. Rivera certified, with exhibits, that she was current through August 2005; that she had made $14,900 in payments which the mortgagee had not credited; and that her bank was investigating its withdrawals from her account (Docket entry 35).

### The Court's September 12, 2005 Order to Show Cause.

On September 12, 2005 this court *sua sponte* issued an Order to Show Cause to

---

7. The cure Order of June 1, 2004 (Docket entry 29) provided:

> 5. If the Debtor(s) should default and fail to make the payments stated herein or any future payment outside of said plan to ALLIANCE MORTGAGE CORP., for more than thirty (30) days from the due date, then, upon Certification of Non–Receipt of said payment in accordance herewith, submitted by the Secured Creditor's Attorney,

> the Court will enter an Ex–Parte Order Vacating the Automatic Stay of the Bankruptcy Code with respect to the Secured Creditor's lien. The Order submitted will not require the consent of the Debtors regarding form or substance, however Debtor(s), Debtor'(s) attorney and the Trustee shall be given five (5) days notice of any filing of a Certification of Non–Receipt.

*See generally* note 4, *supra*.

address the anomalies[8] in the secured creditor's filed certification of default (Docket entry 38). After becoming concerned about the certification execution process used by S & D, the court reviewed a sample of dockets to which S & D had made similar filings, citing in the Order to Show Cause some twelve other cases in which Amirah Shahied signatures were utilized. The mortgagees or primary servicers varied in these cases,[9] but the signature pages were suspiciously constant.

Besides requiring EverHome and S & D to show cause why the stay relief as to Ms. Rivera should not be denied, they were plainly advised of their jeopardy in that the court would consider sanctions for contempt and violation of *Fed. R. Bankr.P.* 9011. Advice was also given regarding the potential for a referral to appropriate ethics authorities, and to the Office of the United States Trustee (who was noticed on the Order to Show Cause), and that the court would "take further action as would be appropriate under the circumstances" (Docket entry 38, ¶ 3(v)). Certain document production and written statements, including statements of position, were required of S & D and EverHome in advance of the return date of the Order to Show Cause.

*Submissions In Advance of October 18, 2005 Hearing.*

The S & D and EverHome prehearing submissions were telling (*see* Docket entries 46 and 45 respectively). First and foremost, the S & D submission was an unambiguous admission that presigned client signature pages for certifications were being used by the law firm. Moreover, in response to the court's inquiry as to the employment of Amirah Shahied, it was learned that she had been a LOGS employee from September 23, 2003 to a date on or shortly after the transition to FANDO, but was not employed by either after July 29, 2004 (Docket entry 46, Main Doc. 6–7). It was thus clear that at the time the default certification in *Rivera* was filed, the Shahied signature had been used by S & D for over twelve months after her departure.

EverHome's prehearing submission and that of S & D were consistent in their assurance of the accuracy of the Rivera data supplied to the court. They also introduced the court to the functional presence of FANDO (up to that point transparent to the court), the pivotal role played by default outsource servicers, and some of the LOGS/FANDO history. EverHome included its Default Services Agreement dated February 1, 2004 (between and among EverHome's predecessor, Alliance Mortgage, LOGS and Shapiro & Kreisman, LLC, the Illinois law firm).

While consistent as to allegations of data accuracy and FANDO's general role, the two submissions diverged as to authoriza-

---

8. The preamble to the Order to Show Cause details the court's observations of the immediate certification, as follows:

 [T]he signature page has the appearance of having been telefaxed on "12/24/2003," bears "8" as a paragraph number with the next preceding page ending with a paragraph numbered "5," and is otherwise undated, yet relates to defaults in a period ranging from November 1, 2004 to August 15, 2005, and, further, ... the certification appears to be signed by one "Amirah Shahied" without reference to that person's position with Everhome Mortgage Company ... on its face, the purported paragraph 8 including the signature of "Amirah Shahied" appears to have been simply affixed to the five-paragraph first page of that Certification of Non–Receipt of Monies....

9. The named secured parties or servicers in this sample of twelve included: Federal National Mortgage Association, Washington Mutual Bank, F.A., and Mortgage Electronic Registration Systems, Inc.

tion and mechanics of document execution on behalf of EverHome. S & D, through counsel, asserted the following: "Everhome/FANDO and Shapiro & Diaz agreed that to facilitate the review of documentation and to provide original signature pages to Shapiro & Diaz, that [sic] FANDO would supply pre-signed signature pages to Shapiro & Diaz" (Docket entry 46, Main Doc. 3, last para.). No such agreement was ever established by testimony or documents, nor was FANDO's participation even feasible with respect to the Shahied signatures which had a pre-FANDO telefax header date of 12/24/2003. Moreover, EverHome through the certification of its officer, Ms. Haffke, detailed those FANDO employees who were authorized to sign documents on its behalf, and specifically denied that Amirah Shahied was ever so authorized (Docket entry 45, Haffke Aff. ¶ 21).

### The October 18, 2005 Hearing.

After an adjournment at counsels' request, the return of the September 12, 2005 Order to Show Cause was heard on October 18, 2005. (*See* 10/18/05 transcript "Tr. I," Docket entry 51.) At hearing outset, S & D's counsel produced a list of cases in response to the court's specific inquiry regarding use of Amirah Shahied presigned certifying statements.[10] That list, marked in evidence as hearing exhibit "RS & D # 1," included some 294 line items, with docket numbers and "filing dates" per docket number. Of this number, at least 251 "certifications" were filed after Ms. Shahied's LOGS/FANDO association terminated on July 29, 2004.[11]

At the hearing, the court required testimony, particularly since S & D's prehearing submission included only counsel's certification.[12] Nelson Diaz took the stand, identifying himself as S & D's managing attorney but not an equity holder. He had been with S & D and its predecessor firm since 1992 (admitted to practice in 1987). Mr. Diaz confirmed that financial control of the firm resided with Messrs. Shapiro and Kreisman, the equity holders, in Illinois; however, his contact with them as to operational matters was extremely limited. Indeed, Diaz had never met Mr. Shapiro and saw Mr. Kreisman only on his visits to New Jersey (at least twice a year). He testified that S & D's operational performance was measured in terms of timeliness (as well as accuracy).

Regarding execution of certifications, the managing attorney explained that on-file signatures on "blanks" were retained by S & D "so that when the motion was to be filed, the original signature would be attached," Tr. I 28:9–10, and that the blanks would be supplied as forms by S & D "[a]t the servicer's request," Tr. I 28:21, the servicer "[b]eing LOGS, being FANDO, whichever entity it may have been." Tr. I 28:23–24.

Diaz further testified that the presigned forms were now destroyed, and that he

---

10.
> If counsel shall have, as a regular course, affixed a presigned form signature of "Amirah Shahied" to supporting documentation filed with the Court, counsel should be prepared, at the hearing, to identify by docket number all cases now pending in the United States Bankruptcy Court, District of New Jersey, in which counsel filed such a supporting certification.

(Docket entry 38, OSC, ¶ 9, September 12, 2005.)

11. The court independently reviewed case dockets to verify and clarify certain exhibit line item entries.

12. S & D's counsel justified his certification as to basic facts by emphasizing that ethics issues were raised by the court in the initiating Order to Show Cause, and, he surmised, there was the potential for a "criminal referral." Tr. I 9:17.

could not remember the names of the signatories. He confirmed that S & D had recently initiated a change where, unlike past S & D practice, the final form of certification to be filed with the court is presented to the servicer's representative, who signs it contemporaneously with that review.

After a recess, Mr. Diaz requested to be excused from further testimony until he could consult with independent counsel. The court granted his request, and a like request of Rhondi Schwartz, Esq., the S & D bankruptcy attorney who actually filed the Rivera *ex parte* application.

The hearing also produced a challenge by the Debtor's counsel to the accuracy of the default information proffered by S & D in the purported certification that would support stay relief. "We have checks that were sent, but my client pays her mortgage by a transfer from her bank." Tr. I 15:24–16:1. And so a complicated payment dispute arose involving checks said to be mailed and returned *and* electronic transfers thought to have been directed to EverHome.

### The Court's October 24, 2005 Order to Show Cause.

After considering disclosures to that point, the court broadened its inquiry by Order to Show Cause of October 24, 2005 (Docket entry 50), requiring responses from the apparently pivotal subservicer, FANDO, as well as the S & D equity holders, Messrs. Shapiro and Kreisman, and their Illinois law firm. The Order defined, as established, the "S & D Certification Practice" [13] under scrutiny and enjoined that practice.

Witnesses were identified for the anticipated second hearing, and certain disclosures were required in advance of that hearing. In particular, the court required a list of cases filed in this district in which certifications prepared under the questioned practice were used, and a list of those named signatories whose presigned blanks had been held in the S & D files for such use. And, EverHome, FANDO and the Debtor were required to review records to determine the status of Ms. Rivera's post-petition (and post–6/1/04 cure order) payments.

### The Court's November 9 and November 14, 2005 Orders.

At FANDO's counsel's request, the second hearing date was adjourned from November 18, 2005 to December 14, 2005. *See* Order of November 9, 2005 (Docket entry 57). At the same time, the court received a five-page letter from S & D's counsel which seemed to defend staunchly his client's intent in employing its certification practice, while seeking clarification "of the charges being pursued by the Court." Docket entry 59, at 4, ¶ 4. A conference was requested.

By Order of November 14, 2005, the court scheduled an on-the-record conference for November 30, 2005 (Docket entry 61). That order also required additional disclosure (S & D's fee structure for stay relief), as well as interim reporting as to the status of document/data production or-

---

**13.** That practice was the use of supporting certifications for stay relief motions and *ex parte* applications for stay relief, *"those certifications having affixed to them a certifying statement and signature page which was on file with S & D in advance of the preparation of the substance of the certification, where the substance of the certification and the final form of the certification were not contemporaneously reviewed by the purported signatory at the time of the purported signing, and, indeed, it appearing that the final form of certification was never reviewed by the purported signatory prior to its filing with the Court...."* (Docket entry 50 at 2.)

dered earlier. Parties-in-interest [14] were to be prepared to discuss at the conference efficiencies which could be employed to expedite the hearing process. And, the court advised and admonished the parties-in-interest that it was considering referral of the matter to the Office of the United States Attorney "for further investigation and, in that Office's discretion, action under its prosecutorial authority." (Docket entry 61 at 3.)

### The Prehearing Conference of November 30, 2005.

Ten lawyers appeared at the conference (representing both the parties-in-interest and potential hearing witnesses). In full colloquy, the court presented its concerns with the S & D Certification Practice, agreed to review written statements from named witnesses (in lieu of appearance requirements or as an aid in condensing testimony), and catalogued the orders, rules and authority that the subject practice should be measured against. *See generally* transcript of November 30, 2005 (Docket entry 66), hereinafter "Tr. II."

The court specified that as to its inquiry "[t]here are very definite rules that apply," Tr. II 65:20–21. Local Bankruptcy Rule 4001 was cited, and LBR 4001(b) and (c) were particularized for their references to necessary *certifications*; the June 1, 2004 cure Order was deemed to be the law of the Rivera case, requiring a *certification* to advance an *ex parte* application for stay relief; the *certification* requirement as reflected in default forms made available on this district's bankruptcy court website was identified; and, this court's general orders of March 27, 2002 at II(c)(2) and November 19, 2004 were noted. Tr. II 65:21–66:11. *See* notes 4 and 7 *supra.* The court reiterated its position as to possible *contempt* and *Fed. R. Bankr.P.* 9011 violations, as well as issues concerning the applicable Rules of Professional Conduct.[15]

Specific reference was made to 11 U.S.C. § 105(a) court enforcement powers, to the certification requirements of 28 U.S.C. § 1746, and to the court's inherent powers "to enforce its orders and maintain its systems and assure ... the integrity of the Court processes...." Tr. II 67:5–14.

### Submissions In Advance of December 14, 2005 Hearing.

Among the many affidavits/certifications filed in aid of the second hearing of this matter was the certification of Ms. Schwartz. In most pertinent part, Ms. Schwartz said:

> I am aware that Shapiro & Diaz was using pre-signed original certification

---

**14.** "Parties-in-interest" were defined in the Supplementing Order entered by the court on November 14, 2005 as

> (i) those required to show cause per the September 12, 2005 Order and the October 24, 2005 Order, and those subject to the injunction set forth in the latter Order (to wit: S & D, Everhome Mortgage Company, Gerald Shapiro, Esq., David Kreisman, Esq., Nelson Diaz, Esq., Rhondi L. Schwartz, Esq., Shapiro & Kreisman, LLC and First American National Default Outsourcing, Inc./"FANDO," these parties also referred to as "respondents"); and, (ii) Jenny Rivera, Standing Chapter 13 Trustee Greenberg, and the Office of the United States Trustee.

(Docket entry 61 at 2, footnote).

**15.**

> You know, the Court is concerned that there is a contempt here of its general orders, rules, and the [6/1/04] order. The Court is concerned that this was a document or a series of documents submitted for an improper purpose under [*Fed. R. Bankr.P.*] 9011(b)(1), and if one views what I would call a misleading certification as factual under (b)(3) of [*Fed. R. Bankr.P.*] 9011, and frankly, the Court is concerned about candor issues of the RPC's at 3.3 and the independence of counsel, which is very troubling, at 5.4(c) of the RPC's.

Tr. II 66:21–67:4.

pages for motions for relief from stay. I did not, however, believe that the procedure violated any court rule, bankruptcy rule, law or ethics rule. Every time I filed a pre-signed original certification page in connection with a motion for relief, I did so knowing that the information in that certification had been provided by the client (through the outsourcer) contemporaneously with Shapiro & Diaz's preparation of the certification. Also, as detailed above, I ensured in each instance that the information contained in each such certification accurately and correctly reflected the contemporaneous information provided by the client and that such information was consistent with our records and prior filings and reflected the client's understanding of the true state of affairs. I am aware that the process employed at Shapiro & Diaz involved transferring the information contemporaneously provided by the client to a certification, affixing the presigned signature page, and filing it with the Court. I am confident that this process did not result in the submission to any Court of any misleading or inaccurate information. Nor was it ever my intention to mislead the Court in any way.

Docket entry 75, ¶ 9.

Though Ms. Schwartz said she did not "believe that the [S & D Certification Practice] violated any court rule, bankruptcy rule, law or ethics rule,"[16] she said that she did not know that *photocopies* of presigned signature pages were being

used, apparently as a result of processing at S & D by a young legal assistant. "[H]ad I recognized that a photocopied signature was being used ... I would have required an original signature before filing." Docket entry 75, ¶ 11.

And, S & D's discontinuation of its practice was noted by Ms. Schwartz. "In every case, we now obtain an original signature from the client, which is executed at the time the client reviews the final form of the certification." Docket entry 75, ¶ 12. She did not explain why this "new" practice was not undertaken in the first place.

Mr. Diaz's prehearing affidavit gives something of an explanation:

I was not involved in the implementation of this practice, nor its use, because it appears the practice began prior to the time that I became responsible for the firm and I was not involved with the firm's bankruptcy practice since at least 1993 and it appears that it is something that just evolved over time.

... I know that there were times when we were dealing directly with the clients, before default outsourcers were involved, when certifications were being sent to clients for review and signature.

... I know that problems were experienced in getting these certifications back from the clients in a timely manner, and in some cases, getting them back at all.

Docket entry 79, ¶¶ 28–30. He acknowledged that the S & D Certification Practice was in place "for several years" and

---

16. This statement of Ms. Schwartz is to be contrasted with her counsel's letter brief, Docket entry 72 at 20, which concluded as follows:

Ms. Schwartz freely acknowledges that the specific procedural requirements for the filing of certifications were violated by the use of pre-signed signature pages. Strict compliance with those requirements, however,

would not have changed the accuracy or reliability of the information submitted to the Court in any respect. Ms. Schwartz took considerable care to question and verify all the information provided by S & D's clients. As a result, she is confident that no incorrect or misleading information was ever filed with any court.

"since at least 2000." Docket entry 79, ¶¶ 26 and 27.

Both the Schwartz and the Diaz statements expressed the absence of any operational directive from Messrs. Shapiro and Kreisman to use presigned forms.

Linda Hynes, Esq., a former S & D employee, provided a prehearing certification (Docket entry 71). She was a newly admitted attorney when hired by S & D's predecessor firm (S & K) in March 2000. Docket entry 71, ¶¶ 1–2. "I was trained ... by Rhondi Schwartz, Esquire." Docket entry 71, ¶ 3. As to the use of presigned certification pages for stay relief, Ms. Hynes stated:

I was aware that there were signature pages signed by certain employees of our clients which were retained by S & K. The bankruptcy paralegal would prepare the Motion package by attaching one of the signature pages. This was the process for the filing of Motions. I was under the impression that this was the way that the client preferred Motions be filed on their behalf.

. . . .

... To my understanding and as represented to me, the S & D practice of utilizing pre-signed signature pages was the standardized practice when I was hired and was the standardized practice when I left the firm in July 2005. Further, it was the practice completely supported by our clients.

... After being advised of Your Honor's pending investigation into said procedure, I have spent much time reflecting on the issue and do now understand that the process was not proper. However, I want to certify to Your Honor that at no time that I was employed by either S & K or S & D, was it my attempt to defraud the court or support any process which would call my integrity into question.

Docket entry 71, ¶¶ 6, 9–10.

Like the young lawyer starting out in the firm, the S & D legal assistant involved in bankruptcy filings was trained to use presigned signature pages in preparing certifications of default. Joshua Wills, in his prehearing Affidavit, said:

At the time I learned how to prepare certifications of default, I was shown how to use pre-signed signature pages for certain clients. To the best of my recollection there was only one person at a time for each of these clients who provided signed signature pages to us for motions for default.

...I was usually provided with a number of original signatures pages at one time. The number of pages that were returned to me by the clients varied depending upon how many the clients supplied at any given time. I used these original signature pages as part of putting together the Applications for Ex parte Relief to be filed with the court.

. . . .

... In every case I was to prepare a certification of default on, on behalf of the client, I always checked the information provided by the client before I included it in a certification of default. Sometimes checking that information involved multiple communications with the client. The client would respond to my inquiries with additional information from the client's records answering my questions and clearing up any discrepancy.

Docket entry 76, ¶¶ 4–5, 10.

Three prehearing submissions by FANDO employees related to preparation of affidavits or declarations. Fred Zakula, the Senior Vice President of FANDO, described the process leading up to the exe-

cution of sworn statements in support of bankruptcy stay relief, as well as the execution process. Docket entry 74. (In fact, it was later learned that Mr. Zakula was an operational executive with LOGS who went over to FANDO in the 2004 transition.) Zakula explained that mortgagees establish arrears standards for bankruptcy cases. Once that level of arrears is reached, a report is generated and FANDO's operations' staff assigns a FANDO bankruptcy processor. The processor examines the computer-generated report "in more detail" for accuracy and as to whether stay relief is required. Docket entry 74, ¶ 3.

> If so, the relevant financial data is compiled from our computer system and rekeyed into another software system for transmission electronically to the retained law firm along with a request that a relief from stay motion be prepared and filed. FANDO expects that law firm to rely on the loan information we provide to it. If an affidavit or other sworn statement is required by the retained law firm, we have policies under which that statement should be sent electronically by the law firm to a FANDO dedicated email box. The statement is then printed out at FANDO, reviewed by FANDO personnel for financial accuracy, signed, executed, and overnighted to the law firm.

*Ibid.*

As to the propriety of the use of pre-signed signature pages, Zakula stated:

> While the Procedures Manuals do not speak specifically to utilization of pre-signed signature pages, they do specify the procedures for handling counsel requests for documents to be executed by FANDO staff, such as affidavits. The Procedures Manuals specify that requests are to be faxed or sent to a specific FANDO email address and that

executed affidavits would be returned to counsel, typically in 2 to 3 days from request, following their review and execution by FANDO staff.

Docket entry 74, ¶ 4. And, he frankly added that FANDO personnel knew of the "New Jersey" requirement of affidavits or declarations in the stay relief process. Docket entry 74, ¶ 5, n. 2. Moreover, "[i]f an affidavit or certification is required by local counsel for a relief from stay motion, such a document is prepared by local counsel and sent to FANDO. The affidavit or certification provided by local counsel is then reviewed for accuracy, completed and notarized by FANDO personnel, and overnighted to counsel generally within 48–72 hours of counsel's request." Docket entry 74, ¶ 5.

FANDO Vice President for Operations Dan Schmidt's declaration confirms the relevant portion of Zakula's statement and adds the following as to Amirah Shahied:

> Information provided to me indicates that the signature in connection with the certification in question in the Jenny Rivera case came from Amirah Shahied, a former employee in LOGS's Milwaukee, Wisconsin office assigned to work on Washington Mutual loans. A review of the records of First American confirms that Ms. Shahied was never authorized to sign on behalf of Everhome. In fact, she would never have had the occasion to sign a declaration/affidavit for relief from stay motion filed on behalf of or in any other connection with Everhome.

Docket entry 73, ¶ 8.

Both Schmidt and Zakula emphasized that currently counsel is typically designated by the mortgagee (EverHome, e.g.) (*see* Docket entry 73, ¶ 3 as to Schmidt), though Zakula states this *in terms of a* change from LOGS policy ("[i]n connection with FANDO's assumption of the LOGS

default servicing, effective June 4, 2004, FANDO's policy of having its clients choose their counsel for legal matters became affective [sic]") (Docket entry 74, ¶ 6).

The third FANDO declarant, Dondrea Lomas, was the actual processor in the subject Rivera default application. She plainly stated:

> With respect to FANDO's general procedures, if an affidavit or other declaration was transmitted to FANDO for completion, I was not responsible for that. When I received the request from the law firm, I forwarded the request to Pablo Valdivieso. Mr. Valdivieso in turn, processes the document to be executed and gives it to another employee at FANDO who is an authorized signatory for Everhome for review and execution. I have no record of a request by the Shapiro and Diaz firm to have an affidavit or certification completed in the Rivera case.

Docket entry 69, ¶ 7.

EverHome's Assistant Vice President Alisa Haffke's Affidavit went directly to the Rivera payment dispute.

> EverHome cannot state definitively at this time that the information contained in the Certification of Amirah Shahied filed on August 9, 2005[sic] in this case is correct because EverHome's efforts (as well as those of FANDO and Shapiro & Diaz) to reconcile its records with Ms. Rivera's payment information is continuing.[17]

Docket entry 68, ¶ 3.

Payment reconciliation problems, territory familiar to bankruptcy courts, are explained by Haffke. Ms. Rivera "has experienced difficulty in obtaining payment information from her bank due to her bank's merger, destroyed records, returned payments and other matters." Docket entry 68, ¶ 4. In addition, Ms. Haffke pointed out other difficulties. "This mortgage was made in the names of Antonio Sanchez, Jenny Rivera and Edwin Negron," generating record-keeping under the Sanchez name; Sanchez filed a Chapter 7 bankruptcy case four days after Ms. Rivera's 2001 filing, so that "[t]hese separate proceedings created confusion," including refusal to accept partial payments from Ms. Rivera; and, Ms. Rivera used wire transfers to pay which might have been "debited against Ms. Rivera's bank account at Fleet, but not forwarded to Everhome." Docket entry 68, ¶ 5. Ms. Haffke's description of the bookkeeping morass is consistent with Ms. Rivera's counsel's report to the court of November 10, 2005 (Docket entry 62). Counsel indicated that four payments were caught up in a revolving process. The installments were initially remitted to EverHome, but returned ("[y]ou have remitted an amount less than total due on your account, without prior arrangement to do so"). Three of the returns were in the form of *EverHome*-issued checks, which were then said to have been both endorsed to and resubmitted to EverHome. The fourth resubmitted item was a Fleet Official check. (Copies of the four resubmitted items were provided to the court by Ms. Rivera's counsel.)

Among its responses to growing mortgagee-mortgagor payment reconciliation disputes, and during the period in which payments were being bounced back and forth between EverHome and Ms. Rivera, this court issued its General Order of Jan-

---

**17.** The S & D submission of the purported Shahied certification of August 2005, cryptically asserted that Ms. Rivera was delinquent for *ten payments due* in the 11/1/04 to 8/1/05 period.

uary 4, 2005 which provides at ¶ 5, the following:

> Secured creditors shall be required to accept debtors' post petition payments, and to apply those payments to debtors' accounts; any such acceptance shall be without any prejudice to, waiver of, or estoppel as to the position of secured creditors in disputes with debtors, including payment and accounting disputes.

*See also* D.N.J. LBR 4001–1 (2005 Comment).

Given the long delay in recovering the Rivera bank records, the court excused Ms. Rivera's counsel from the scheduled December 14 hearing. The Rivera–Ever-Home stay relief dispute was thus deferred.

**The December 14, 2005 Hearing.**

The hearing began with the testimony of Mr. Shapiro. *See generally* transcript of 12/14/05 (Docket entry 85), hereinafter "Tr. III." He confirmed the general structure of the LOGS network of lawyers, LOGS' operation and its 2004 sale to FAN-DO. He also noted that he met Mr. Diaz, for the first time, the morning of the hearing and that he "was not part of operations." Tr. III 20:20. "My partner Dave Kreisman interfaces with the local partner in terms of dealing with their management reports...." Tr. III 21:21–23.

Mr. Kreisman then testified, reviewing the Shapiro and Kreisman history, including involvement in New Jersey back into the 1980s. He graphically described the volume and time pressures impacting on mortgagees' local counsel.

> Then in 1990 HUD came out with their time frame requirements and said you had to complete a case in so many days, weeks, months, in various states. And then, subsequently VA did the same, followed by the GSE's, Freddie Mac, and Fannie Mae. And, they all came up with time frames. And so, we had to learn to slice and dice the—not slice and dice, that's not the way it worked, to manage the work flow better than we did before. And, that continues to today as not only has the time frames shrunk, but there's more competition and everybody's trying to outdo each other in terms of impressing clients as to their capability of moving work.
>
> Your Honor, I believe that—and, we'll get back to the answer—there is probably—I'm going to—this is a guess—maybe eight billion dollars worth of files sitting in our offices. Our clients don't expect us to have them sit there and not move them. Nor, would we expect not to move them. So, it becomes a process driven business.

Tr. III 34:16–35:7.

Like Shapiro, Kreisman disclaimed any knowledge of S & D's use of presigned certification pages. His management of S & D was only time-line measurement. He agreed that the S & D Certification Practice was "poor management and poor judgment" on S & D's part. Tr. III 40:1.

As to the LOGS' operation, Kreisman's focus was on law office performance rather than the data interface between LOGS and the mortgagees. Tr. III 40:16–18. He considered LOGS to be "the back office for the lender." Tr. III 41:16–17.

Q At that moment, before there's a referral to Shapiro & Kreisman, what records were available to LOGS Financial as a back office operator?

A I believe they had access to the system that housed the data.

Q EverHome's full system?

A I believe so.

Q Okay.

A But, there are others who know more about this than I do in that organization, and who probably could give you a more reliable—but, I think that's what it was.

Tr. III 41:21–25; 42:1–6.

Q Would Catapult [the Shapiro & Kreisman document development program] then pull certain data—

A Yes.

Q —and send it to Shapiro & Diaz?

A The law firm. Yes.

Q And, that would not be all the data, just certain data that was pre-programed.

A Just certain data that we needed to commence the case, yes, right.

Q Okay. So, if I have it right, LOGS Financial would have access to the full files of EverHome, would act as its back office servicer, upon the designation of a referred law firm Catapult would pick certain data that was preprogrammed,—

A Correct.

Q —and send it to the law firm?

A Correct.

Q Is that all a fair statement?

A As far as I know that is a fair statement.

Q All right.

A I was not a key player in that process, the LOGS Financial process side. But, I believe that's how it worked.

Q Okay. Now, if we look at LOGS Financial, I heard your partner say there was 700 employees—

A Six or 700 people at one time.

Tr. III 44:2–24.

When Kreisman testified to what a LOGS processor had available to him/her on the computer screen ("they had data available for them to access so they could—just as if the client were to do it") (Tr. III 45:20–21), Ms. Schwartz's counsel questioned Mr. Kreisman's specific knowledge. Tr. III 46:15–50:21.

On cross-examination, Mr. Kreisman testified to the very modest salary of Ms. Schwartz, as set by him and, again, about his central management oversight of the network law firms. "Just how much work they're getting done with how many people." Tr. III 56:20–21. Regarding what data a LOGS processor sitting at a computer terminal would transmit to network law firms, there was the following testimony:

Q Now, you testified in response to some of Judge Stern's questions about what someone sitting at LOGS looking at a CRT terminal would have been able to see. Do you know how the interaction went between those servicers, those individuals sitting in front of the screen at LOGS, and the individuals at your various law offices around the country?

A No.

Q Do you have any idea, for example, about how the information flowed from LOGS to the individual law firm, back to LOGS, back to the individual law firm, and eventually to the Court?

A I would have no personal knowledge of that.

Q No personal knowledge about the degree of diligence that was exercised by— .

A No.

Q —the individual sitting in front of that CRT screen?

A No. No.

Tr. III 59:7–23.

The imbedded defense thesis leading to this and other lines of questioning—that

the LOGS or FANDO processor was simply a conduit for CRT screen information between the mortgagee and the local law firm—became the subject of further inquiry by the court as to facts. (As will be seen, *infra*, it has also become the subject of court scrutiny regarding its merit as a defense to violation of Rule 9011 and other charges.)

Linda Hynes, Esq. testified consistently with her prehearing submission. New input from her testimony went directly to the extent of use of presigned forms by S & D. That practice was pervasive and extended back to before her arrival at the firm in early 2000. *The presigned forms were used in "95 percent" of the motions or applications for stay relief, and in a busy month Ms. Hynes submitted eighty such filings.* Tr. III 86:8–12; 89:7–90:1.

Ms. Hynes confirmed the potential for intricacy in discerning mortgagor payment histories. Variables include real estate tax disbursements, insurance expenses, "suspense account" account, escrows, Chapter 13 post-petition account, "lost payments," interest rate variations and the like. *See generally* Tr. III 74–81. She indicated that roughly half the stay relief motion practice required further communication (after receipt of initial defaults data) with the outsourcer. Tr. III 82–14–83:24. Her understanding of the interplay of the outsourcer with the mortgagee, after S & D generated a question, is as follows:

Q Okay. And you would talk to a particular processor at let's say we're dealing with the time when Logs was in operation, processor at Logs?

A. You would have a specific contact at Logs, for example, for—you had an EverHome contact at Logs and a Washington Mutual contact that, you know, was familiar and was handling that set of loans, you

know, in New Jersey, has your own contact.

Q Okay. So if you made contact with someone at Logs who was in charge of let's say an EverHome account, and pointed out something you felt was wrong, for example, that there was an application of a payment to a prepetition arrears which should have been credited post petition in a Chapter 13, understand what I'm saying—

A Yes.

Q I'm sure better than I do, what would the process be? Would that individual in Logs then go check that matter out?

A It was my understanding they did and then they would come back with me, they would respond back with a different due date and new information, you know, they were showing—representing to me that they had, you know, advised the client, the client had adjusted their records accordingly, and this was now the correct information.

Q Okay. So you would be told that the processor went back to EverHome, talked to EverHome, dealt with the records there and then got back to you?

A That was my understanding, that was not explicit in the e-mail, but that was my understanding.

Q Okay. And again, in all of this diligent inquiry by Shapiro and Diaz trying to get things right, you never got back into nor did anyone at Shapiro and Diaz, into actual records of EverHome in the illustration I gave you.

A No.

Q Okay. But someone to your understanding, someone at Logs Financial

or FANDO would have access to those records.

A Yes. And Your Honor, we would then sometimes ask for then an updated pay history, you know, showing us that it had been adjusted, or a pencil ledger, we always preferred a pencil ledger, but in some circumstances we would ask for updated pay histories.

Tr. III 84:3–85:17. Again, on cross-examination Ms. Schwartz' counsel went to the issue of what a particular processor, at LOGS, e.g., "had on the screen in front of him or her in those interactions [with S & D]?" Ms. Hynes did not know. Tr. III 92:2–3. The defense of "processor-as-a-mere-conduit" was pressed nonetheless. *See* Tr. III 93:12–22. But, as with Mr. Kreisman, Ms. Hynes did not in fact know what *the processor* had available "on the screen." Tr. III 95:14–22; 101:5–102:8.

The court then asked FANDO's counsel to provide further input as to the outsourcer-mortgagee data interface, Tr. III 110:14–113:14, expressing doubt but deferring as to its relevance. Tr. III 110:14–23; 111:11; 114:13–116:15.

Ms. Schwartz testified. She was a 1987 law school graduate, employed by S & D or its predecessor firm since 1992. She said she had no idea of when or how the S & D Certification Practice began. There had been a time when clients "actually handwrote" certifications (Tr. III 125:11),

but she could not recall when that practice changed.

When asked by the court about her state of mind when using presigned forms ("I'm trying to understand what went through your mind when you employed the practice ... answer ... any way you want, I'm trying to get at what you could have been thinking. . . ." Tr. III 127:14–18), the attorney's response went to the accuracy of the data in the document. Tr. III 127: 24–25.[18] And, it was what "they" wanted.

Q [By court] But why didn't you utilize a practice which is—what I would call the standard practice, of preparing a certification with input from the client or an outsourcer, and sending it back for signature to the outsourcer, or the mortgagee?

A Because they provided us with the information, and they just wanted to get it filed, they didn't care, they became paperless, they didn't—you know they knew they were giving us the information, and we were going to transcribe that information and file it with the Court. They don't even want copies of the motion after they're filed. They rely on the law office, to do the work.

Q Did you ever question the practice of slapping on a pre-signed form, to a certification?

A No.

Q You never questioned that?

---

**18.** On examination by her own counsel, Ms. Schwartz likewise linked the *accuracy of the information* submitted to the court to the *use of a presigned form.*

Q Okay, as far as the information that you transmitted to the Court, you seem to make an emotional point of the fact that you're very careful in the information that you review, correct?

A Yes.

Q And yet you submitted a certification that contained a signature page that was

signed in advance, and attached to the information, right?

A Yes.

Q Is that because from your perspective the information that you were submitting to the Court was true and accurate information to the best of the knowledge of Logs?

A Yes.

Tr. III 136:11–23. *See also* Tr. III 143:2–19.

A No, I—unfortunately I just—I never even questioned it I did not even think there was anything wrong with it. And I know, in hindsight now, I understand that there was a problem, but no I—I didn't, I mean I reviewed proof of claims, the client provides information and me as an attorney and all attorneys we signed the proof of claim, and again that's a transcription of the client's information and you file it with the Court.

Tr. III 130:19–131:16.

Ultimately, Rhondi Schwartz, Esq. acknowledged that currently, without the use of presigned forms and with certifications being executed contemporaneously with their review at FANDO, the "new" procedure was feasible. "Yes, we're able to do it." Tr. III 135:10.

Nelson Diaz, Esq. then took the stand. He began by testifying that he did not mean to say at the first hearing that he specifically questioned the use of presigned forms before this court raised the issue. Tr. III 153:9–154:5. *Indeed, Mr. Diaz disclosed that he changed his state foreclosure judgment documentation procedure in "[t]he last couple of years" to include the use of presigned certification forms.* Tr. III 155:7–156:25.

Q [By court] So as I hear your testimony and please correct me if I'm wrong, from some time around 2000 or 2001 when you were using the normal process of having certifications reviewed and signed contemporaneously, either by an outsourcer, or by the mortgagee, that then changed at some time within the last few years to using pre-signed certifications and when Fidelity replaced FANDO at or about the time I signed my order to show cause in September, it switched back to the contemporaneous signature process is that a fair statement?

A That is a fair statement.

Tr. III 157:16–25.

After the testimony, the court addressed two open items: the need to resolve the payment dispute between Ms. Rivera and EverHome; and, the earlier requested input on data interfacing. Written statements were requested and a holding date was established for a third hearing if necessary. There was, in fact, no third hearing.

### Post–December 14, 2005 Hearing Submissions—Regarding Data.

In response to the court's request, three submissions were made regarding data interfacings between and among mortgage holder, default outsource servicer, and local counsel.

Fred Zakula, as Senior Vice President of FANDO, described FANDO access to EverHome and Washington Mutual loan servicing computer systems as well as the progression of automation in data transfer between LOGS/FANDO and these mortgagees. Docket entry 86. As to FANDO, its personnel were physically present at Washington Mutual's place of business and across the street from EverHome's.[19] There was thus direct access to the client to answer any data-related questions. As to a specific referral of a default and loan to FANDO by the client, Zakula said:

While FANDO had complete access to the Client's loan servicing computer system for default information, when referring a loan to FANDO, the Client, in the interest of expediting the transfer of

**19.** FANDO no longer serves as a default servicer of either EverHome or Washington Mutual.

loan data to the law firms retained by the Client, would specifically provide certain information to FANDO which the Client believed was necessary for it to engage counsel. This information would include: customer name; account number; property and mailing address; general details on the loan, including data of origin and original amount of the loan; current principal balance; the due date for the most recent installment due; the payment amount due; the amount past due, and accrued interest and other fees and expenses which may be due. Information not related or necessary to FANDO's role as default servicer would not be specifically provided but, as noted, could still be obtained from the Client's loan servicing system.

Docket entry 86, ¶ 4. FANDO would then manually input necessary data through its "Catapult" software program to the local law firm.

Client–LOGS/FANDO transmittal of data evolved over time, the latest involving a fully automated "screen scraping" process; nevertheless, Catapult input to law firms remained manual.

Ms. Haffke, for EverHome, provided a supplemental affidavit which was consistent with Zakula's supplemental submission. Docket entry 88. She identified EverHome's "Fidelity/MSP" (or "mortgage servicing package") as the software which provided information to LOGS/FANDO. "The same information regarding a defaulted mortgage loan account available to EverHome through the Fidelity/MSP System is also available to the default outsourcers through their direct access to the same Fidelity/MSP System." Docket entry 88, ¶ 5. In terms of available information, "hard" files, and post-default file responsibilities, Haffke stated:

The Fidelity/MSP System contains identifying information for the customer, including name, billing and mailing address, property address, payment and default history, general information regarding the loan, including principal and payment amounts, interest rate, due dates, etc., notes regarding contacts with the customer or counsel or other activity on the file, escrow funding and disbursement records, advances made on behalf of the customer, and investor information. Additionally, once a foreclosure or bankruptcy matter is referred to the outsourcer, the outsourcer is provided with copies of the "hard" file relating to a particular loan (including the loan documents) and is responsible for maintaining and updating that file (both as to computerized and hard records) as the proceedings move forward. The file is not returned to EverHome until the foreclosure or bankruptcy case is concluded, or the matter is treated as "contested" and is referred to other counsel.

Docket entry 88, ¶ 6.

Ms. Schwartz's counsel apparently located Amirah Shahied, and submitted her certification. Docket entry 89. Much of Ms. Shahied's certification went to the defense of the accuracy of what was filed by S & D, and about her lack of awareness of the impropriety of offering presigned certification forms.

I signed the signature pages in bulk at the direction of my supervisor, Mashandi Robinson. Ms. Robinson explained to me that another employee, a male whose name I cannot recall, was leaving the company. That male employee, I was told, had previously been tasked with pre-signing the signature pages. I questioned Ms. Robinson as to whether it was appropriate for me to sign the signature pages in advance. She answered that it was the company's normal procedure.

... I have no recollection of being told by anyone at FANDO or LOGS that either company had a policy prohibiting the use of pre-signed signature pages for certifications or that such use violated any policy, rule or regulation of either company. I certainly never thought I was doing anything improper by signing blank signature pages that would be attached to certifications containing the information provided by FANDO and LOGS.

Docket entry 89, ¶¶ 10, 11.

### Post–December 14 Hearing Submission—Rivera Payments.

EverHome's counsel and Ms. Loughlin for Ms. Rivera, reported to the court (Docket entries 92 and 111, respectively). Ms. Loughlin indicated that *four* payments thought to have been remitted by Ms. Rivera were never received by EverHome. These installments included the Fleet Official check referenced earlier by Ms. Loughlin and presumably three electronic transfers deducted from Ms. Rivera's account but never received by EverHome. Therefore, and as a result of inquiry during the pendency of the immediate court proceeding, Ms. Rivera's bank recredited her account with the lost bank check (as referenced in Docket entry 62), as well as the three other incomplete transfers. *See* Docket entry 111. An amount equal to the four recredited payments ($4 \times \$1,490$ or $5,960) was then deposited by Ms. Rivera into her attorney's trust account. *Ibid.*

It was also explained that no payments were credited to Ms. Rivera's mortgage account by EverHome in the June 2004—March 2005 period. *Ibid.* Those ten missing installments (the subject of the "Shahied" default submission of August 2005), were thus partially "accounted for" by the four would-be payments *now* recredited to Ms. Rivera's account by her bank. (What about the other six installments?)

Finally, on May 17, 2006, a form of "Stipulation and Consent Order" was submitted to the court for consideration, executed by Ms. Loughlin for Ms. Rivera, EverHome's counsel, and counsel to America's Servicing Company ("ASC") (a servicer for HUD, a recent assignee of the subject mortgage). There, it is stipulated that as of August 16, 2005, *seven* monthly payments of $1,490 were due (*neither* only the *four* payments thought to have been made by Ms. Rivera and ultimately recredited by her bank *nor* the *ten* payments reflected in the "Shahied" document which supported the immediate stay relief application).[20] The arrears total of $10,430 is to be paid now (presumably out of the $5,960 held in trust by Ms. Loughlin plus the total of three more monthly installments).

ASC, as EverHome's successor-in-interest, shall take all necessary steps to credit Ms. Rivera's account to show $10,430 in arrears as of August 16, 2005, rather than the amount claimed in the certification of default filed with this Court by EverHome on August 16, 2005 ($15,229.44)....

Docket entry 116. Upon payment, Ms. Rivera would then have cured (for a second time) her post-petition arrears and would be back on track to make regular mortgage payments. Foreclosure, once again, shall have been avoided.

### Range of Disciplinary Options Available to Court.

*Fed. R. Bankr.P.* 9011 is the most specific disciplinary option available to bankruptcy courts concerned with questionable written submissions. "Representations to

---

**20.** The court assumes that EverHome either "found" the three resubmitted checks it issued as returns to the mortgagor in November 2004 and January 2005 (attached to Docket entry 62), or declared them lost and never presented for payment; in either scenario, those checks would represent a credit of three installments to Ms. Rivera.

the Court" are well-defined there, and arise as a function of "signing, filing, submitting, or later advocating" a writing presented to the court. Rule 9011(b). Provision is made for sanctions "upon the attorneys, law firms, or parties" who violate these representations. Rule 9011(c). *Compare* 28 U.S.C. § 1927 (allowing the court to charge fees and costs against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously").

More generally, this court retains the inherent power to administer its day-to-day work,[21] and the power to issue orders "necessary or appropriate to carry out the provisions of" the Bankruptcy Code.[22]

### *Application of Rule 9011 to Ms. Schwartz and S & D.*

■ The filing by Ms. Schwartz of the purported certification in the captioned case (*Rivera*), and the long-term S & D Certification Practice, expose *at least* Ms. Schwartz and the firm to potential Rule 9011 sanctions.

Has Ms. Schwartz (in *Rivera*), or the firm (in its general practice), violated the representation to this court "that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the purported certification(s) was/were "not being presented for any improper purpose"? Rule 9011(b) and (b)(1) (preamble). Do these filings include "factual contentions" without evidentiary support? Rule 9011(b)(3).

The document submitted in this immediate case, and those filed over the years in the S & D Certification Practice, were not certifications. Yet they were submitted as if they were certifications. No reasonable attorney would consider them to be certifications, nor would any reasonable attorney engage in the practice of using "on-file" signature forms. This practice is in violation of Rule 9011—because writings were presented for an "improper purpose," i.e., to have the court believe they were certifications. Moreover, the threshold "factual contention" in each of the ersatz submissions—that the signatory read and signed the document—is flatly untrue (not to mention without any evidentiary support). As to the use of "Amirah Shahied" presigned forms after her departure from LOGS/FANDO, even the most perfunctory inquiry would have disclosed the absence of Ms. Shahied. Under these circumstances, nothing in the processing of a final form of certification for signing done by Ms. Schwartz or S & D was "reasonable"—certainly no inquiry was made per Rule 9011(b), and hence no reasonable inquiry into the *bona fides* of the signatories could support these filings. Nor does Ms. Schwartz or anyone else involved in the day-to-day S & D operation contend that any responsible attention was paid to the *process of certifying* the documents submitted to the court.[23] In violation of Rule 9011(b), Ms. Schwartz, Mr. Diaz and S & D as a firm exhibited clear "knowledge,

**21.** *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1224–25 (3d Cir.1995)(acknowledging extension of inherent court powers as described in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) to bankruptcy court sanctioning authority).

**22.** 11 U.S.C. § 105(a). *See, e.g., In re Clark*, 223 F.3d 859, 864 (8th Cir.2000). A number of courts have linked the bankruptcy court contempt power to this section. *See, e.g., In*

*re Pace*, 67 F.3d 187, 193 (9th Cir.1995); *In re Ragar*, 3 F.3d 1174, 1177 (8th Cir.1993); *In re Skinner*, 917 F.2d 444, 447 (10th Cir.1990); *In re Walters*, 868 F.2d 665, 669–70 (4th Cir. 1989); *see generally Collier on Bankruptcy* (15th Ed.) § 105.04[1].

**23.** It is elementary that the declarant must *read* and *sign* the certification. As to the requirement to read, the Advisory Committee Note to the 1993 revision of *Fed.R.Civ.P.* 11, explicitly referenced by the Advisory Commit-

information, and belief" that *presigned forms* were being used as a regular, routine and daily matter. This, of course, is the converse of the representation required of attorneys by Rule 9011.

The pervasive and rogue use of presigned forms for "certifications" by S & D is illustrated by the following:

(i) The S & D Certification Practice has been imbedded in the firm for a substantial period (going back to at least 2000, if not much longer, though no one at the firm seems to remember when or how the practice began);

(ii) Ms. Hynes testified that at least ninety-five percent of the motions or *ex parte* applications she filed used the presigned forms, and in a busy month she filed eighty or so such documents;

(iii) Young staff members (Ms. Hynes, newly admitted to the bar in 2000 and Mr. Wills, a paralegal) were trained in the practice of using on-file presigned forms as if it were

acceptable in the ordinary course of the practice of law—that training being conducted by Ms. Schwartz (the firm's principal bankruptcy attorney) who has been practicing since 1987, in a firm managed day-to-day by Mr. Diaz, likewise admitted to the bar in 1987;

(iv) The S & D Certification Practice spread from bankruptcy to state court foreclosure practice (an area serviced by Mr. Diaz), at some time after 2000;

(v) The "Amirah Shahied" filings—only a part of the S & D Certification Practice volume—totaled approximately 250 *after she left her job*; and

(vi) Even where FANDO provided guidance for obtaining certifications in support of stay relief, Ms. Schwartz, variously, disclaimed knowledge of that guidance. *See* Tr. III 133:11–134:1; 136:5–10; 142:3–12.

S & D had become a paper-pushing factory; the pressure of turnaround time

tee Note to the parallel 1997 revision of *Fed. R. Bankr.P.* 9011, observes that there is no need to state such an obvious requirement:

> **Subdivision (a)**.... The provision in the former rule that signing a paper constitutes a certificate that it has been read by the signer also has been eliminated as unnecessary. The obligations imposed under subdivision (b) obviously require that a pleading, written motion, or other paper be read before it is submitted to the court.

The declarant's original signature is likewise mandatory. *See Blumberg v. Gates*, 2003 WL 22002739 August 19, 2003 (C.D.Calif.) (the court refused to accept an *ex parte* application to amend scheduling orders where the supporting declarations of Katherine S. Bloomfield (attorney) were signed by Stephen Yagman (attorney) "for" Ms. Bloomfield):

> This is unacceptable, as one may not sign a declaration "for" another in this manner, with no explanation proffered.
> To be valid, 28 U.S.C. § 1746 requires that such declarations be "subscribed" by the declarant "as true under penalty of perju-

ry." *Id.* In pertinent part, 18 U.S.C. § 1621, which governs liability for perjury under federal law, mandates that: "Whoever ... in any declaration ... under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true ... is guilty of perjury." 18 U.S.C. § 1621. *The probative force of a declaration subscribed under penalty of perjury derives from the signature of the declarant. Without the declarant's signature, a declaration is completely robbed of any evidentiary force.* *Blumberg*, *1 (ellipses in original; emphasis added). *See also Becker v. Montgomery*, 532 U.S. 757, 764, 121 S.Ct. 1801, 149 L.Ed.2d 983 (2001) ("As Rule 11(a) is now framed, we read the requirement of a signature to indicate, as a signature requirement commonly does, and as it did in John Hancock's day, a name handwritten (or a mark handplaced)"); *Jenkins v. Sladkus*, 226 F.R.D. 206, 207 (S.D.N.Y.2005); *Cobell v. Norton*, 310 F.Supp.2d 77, 84–85 (D.D.C.2004).

from receipt of a file to stay relief application, as this court interprets the testimony,[24] was the driving force at the firm. That type of pressure must impact on other firms providing services to large mortgage holding companies and their servicing agents, and perhaps prompts their taking unauthorized shortcuts. Notwithstanding such pressure, the S & D Certification Practice, simply put, is and always has been *unacceptable.*

■ This court need not find "bad faith" or a nefarious intent in order to conclude that Rule 9011 representations were breached.[25] *See, e.g., Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.,* 498 U.S. 533, 551, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991); *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.,* 57 F.3d 1215, 1225 (3d Cir.1995); *Jones v. Pittsburgh Nat'l Corp.,* 899 F.2d 1350, 1358 (3d Cir.1990); *In re Kouterick,* 167 B.R. 353, 362–63 (Bankr.D.N.J.1994). The "pure-heart-and-empty-head" defense is not available to anyone faced with Rule 9011 sanctions. *See, e.g., Gaiardo v. Ethyl Corp.,* 835 F.2d 479, 482 (3d Cir.1987); William W. Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 187 (1985).

And, indeed, in this era of electronic filing courts have been quick to protect bankruptcy administration against attorneys who—even with good intentions— have signed their clients' names to bankruptcy petitions. *In re Wenk,* 296 B.R. 719, 725 (Bankr.E.D.Va.2002) held that an attorney who files an electronic petition "represents to the court" that the attorney "has secured an originally executed petition physically signed by the debtor" *before* filing the case electronically. In *Wenk* bad weather prevented the debtor from going to the attorney's office on the planned filing date to sign the petition; the attorney had his paralegal file the petition electronically, and the debtor never signed the hard copy. The filing of the petition bearing the debtor's electronic signature before the debtor signed the hard copy was deemed to be fraud, no different from an attorney's forging the client's signature on a submitted pleading. The attorney in *Wenk* violated Rule 9011 "because there could not have been a belief that the filing of a petition with what amounts to a forged debtor's signature ... was proper or warranted under existing law or a good faith argument to extend the law." *Id.* at 728. *See also In re Phillips,* 433 F.3d 1068 (8th Cir.2006) (attorney's reliance upon debtor's signature on prior bankruptcy petition was basis for Rule 9011 sanction); *In re Jerrels,* 133 B.R. 161 (Bankr.M.D.Fla.1991) (attorney's filing of petition in reliance on co-debtor spouse's representation of authority to sign petition on behalf of the absent party, under circumstances where residence was about to be foreclosed, violated Rule 9011); and *In re Nesom,* 76 B.R. 101 (Bankr.N.D.Tex.1987) (attorney's signing of clients' names to bankruptcy schedules was deemed to be a Rule 9011 violation). Given this precedent and the absence of any necessity to find "bad

---

**24.**
[Mr. Kreisman as to how he judged affiliated law firm performance] A combination of things. There's the productivity of the firm. ... You look at time frames, are we getting the work done quickly enough to satisfy the industry requirements? What the FHA–VA Fannie, Freddie, as well as any client expectations.
Tr. III 56:19–25.

[Ms. Hynes on deadlines she was to meet at S & D] Well, the time frames were pretty strict so that when I left we were to file motions or ex parte applications within 24 hours of receiving the data.
Tr. III 81:6–8. *See also* Tr. III 34:16–35:7.

**25.** In most particulars, Rule 9011 precedent and that of Rule 11 of the Federal Rules of Civil Procedure are interchangeable.

faith," the court could leave the state-of-mind issue in limbo. However, the conduct in this case is simply too gross and abusive to demur in making a finding in this regard.

In comparing the S & D Certification Practice as a Rule 9011 violation to precedent, the immediate situation is unique in terms of sheer volume and longevity. This court finds more than negligence or gross negligence in the practice; rather S & D, through its experienced counsel, Ms. Schwartz as the seasoned principal bankruptcy practitioner and Mr. Diaz as the managing attorney, operated in bad faith. These attorneys knew the practice of attaching presigned forms to documents required to be certifications was a shortcut; yet they acceded to pressures (whether to get an edge in competition with others, or to best perform by client, firm or industry stopwatch standards, or both).

*"But the Data Is Accurate" and "The Servicer's Administrator Is Just Reading a Screen" Defenses.*

██ Ms. Schwartz punctuated her testimony with statements of insistence that she always sought to provide the court with accurate data regarding mortgage defaults. Of course, the court expects nothing less (especially where stay relief to go forward with home foreclosures is being requested).[26] In fact, though the would-be certification in this case may well have reflected accurately the state of EverHome's records, as has been established over the months since the court first issued its Order to Show Cause, EverHome's records overstated the post-petition arrears. *The records were not "accurate."* Moreover, something *more* than claimed accuracy is required. The rules of this court should be followed; they are well known and it is clear that certifications are mandatory.[27] In fact, electronic filing has caused this court to examine its signature requirements, including signatures on certifications (and accommodations have been made to allow telefaxed signatures to be utilized in advance of receipt of "hard copy").[28] Ms. Schwartz's seeking of refuge in the purported accuracy of her data submission is therefore rejected as a defense to violation of Rule

---

**26.** This court believes that S & D through Ms. Schwartz and others did strive to provide accurate data; if the court thought that inaccurate data was being intentionally proffered to promote home foreclosures, a criminal referral would be made. That is not the case here. Moreover, there are indications that Ms. Schwartz and S & D have been fair and flexible with debtors and the debtors' bar in promoting cure settlements.

**27.** *See* D.N.J. LBR 4001–1 and D.N.J. LBR 9013–1 through D.N.J. LBR 9013–3 along with the related "Recommended Forms and Orders" previously discussed at footnote 4 *supra.*

**28.** The Federal Rules of Bankruptcy Procedure and the Local Rules authorize electronic filing. *Fed. R. Bankr.P.* 5005(a)(2) and D.N.J. LBR 5005–1. In this court the *General Order Establishing Procedure For Electronic Submission of Documents Containing Facsimile Signatures* (dated November 19, 2004) which

amends the *Administrative Procedures for Filing, Signing, and Verifying Documents by Electronic Means* appended to the *General Order* (*Electronic Filing Procedures*) (dated March 27, 2002) sets forth the requirements for submitting documents over facsimile signatures. If a signatory has properly executed an "affidavit, certification, declaration or any other pleading required to be signed under oath or penalty of perjury" (excluding the petition), the attorney may file the document before receiving the signed original by obtaining the signatory's facsimile signature which the attorney submits with a certification stating that the signatory acknowledged the genuineness of the original signature; *that he/she executed the original "in completed form" before sending the facsimile;* and that the attorney will receive the original within seven business days of the electronic filing. (Emphasis added to stress the necessity of review and execution of final document.) *See* public website, United States Bankruptcy Court, District of

9011. A *certifying party must be responsible* for that data submission. The S & D Practice has annulled the purpose of the responsible party requirement: that is, to prompt diligent inquiry by the certifying individual, and a resulting careful statement made under penalty of perjury, with all of its attendant solemnity.

■ Besides protesting the accuracy of S & D data submissions as a defense, a related argument has been advanced. Ms. Schwartz through counsel contends that in our modern state of "e-ness," no one does anything but read a screen, the computer monitor; anyone can read the screen and much of what is there is forwarded to local counsel by the default servicer (FANDO, for immediate purposes). So—as the argument goes—personal responsibility for data accuracy is a myth. Presumably this court's effort to hold some identifiable person responsible for the accuracy of data submission should be abandoned in favor of speed. Then, in the rare eventuation of a dispute by the debtor as to the accuracy of mortgage arrears and debt balances, so goes the undercurrent to the argument, a "real" witness who has reviewed the records will be produced by the mortgage holder (either through a certification or testimony). Of course, particularly with

increased *pro se* involvement, or where debtor and counsel have been separated by the passage of time or other alienating factors, the accuracy of mortgagee data may well go unchallenged and be off the court's "radar." Debtors are notorious for having their bookkeeping in disarray, and, as has been demonstrated in this case, there are complications in that bookkeeping which are quite challenging.[29] Such de-emphasis of personal responsibility (sometimes replaced by attorney "certifications"), is not and never has been approved in this district. That should suffice to negate the defense of Ms. Schwartz and S & D to a plain-as-day Rule 9011 violation. In addition, however, (i) the current approach is *not* an impediment to prompt and efficient processing of stay relief applications;[30] and (ii) mortgage holders and default servicers can interact relatively seamlessly so that a person certifying to a diligent review of records in support of a stay relief application can be more than an automaton, parroting only the bare minimum of "scraped" data. Indeed, this case has made it clear that FANDO has had very direct access to mortgage-holders' records, has maintained a physical proximity to its clients, and has a broad range of mortgagee data available to it.[31] A FAN-

---

New Jersey, *www.njb.uscourts.gov*, "Local Rules/General Orders," "General Orders" for the *General Orders* referenced above.

29. Initiatives are on-going in some districts to have Chapter 13 debtor-mortgagors pay their regular mortgage installments through the Chapter 13 standing trustees during the pendency of the plan. These initiatives should be studied and considered on a cost-benefit basis for their potential in reducing bookkeeping turmoil.

30. Tr. III 133:1–10; 135:2–12.

31. This court has a variety of concerns about access to and availability of a *full and complete* payment history of the debtor's mortgage obligation, about credits for payments

(including the continued payments following a bankruptcy petition), and about the availability to a debtor of an accurate periodic balance and payoff amount. This is particularly important as mortgagees and/or servicers change (impelled in part by securitization through large lots of mortgage paper), as variables in mortgage balance accounting increase, and as bankruptcy adds layers of complexity. Amounts which should be credited to accounts do, on occasion, get lost in one or another system. Payoff amounts are not always accurate. Chapter 13 plan-end mortgage balance amounts are sometimes disputed. *Meaningful auditing of all of the above should be a high priority for appropriate regulators.* With these concerns, this court would be reluctant to ease diligent inquiry and iden-

DO representative is thus in a position to be a responsible certifier of data. *In reviewing a final form of certification, that responsible person should "think twice" about signing on if there is any question of data accuracy or the diligence of the inquiry process.* The significance of the affidavit or certification signing process is driven home *sub judice*—where EverHome had identified only certain of the LOGS/FANDO personnel who could execute such documents on its behalf, and FANDO had formalized a procedure for obtaining signatures. Ms. Schwartz and others who filed under the S & D Certification Practice circumvented these court requirements, employing the deception of a document intended to look like a client certification.

The Rule 9011 violations by Ms. Schwartz in this immediate case and by S & D here and historically, are established by evidence which is essentially undisputed. The proof of violations is "clear and convincing" in every sense, and is "substantial." *See In re Intercorp Int'l, Ltd.,* 309 B.R. 686, 692–94 (Bankr.S.D.N.Y.2004) (applying a "clear" and "substantial" evidence standard of proof as to a Rule 9011 violation) (relying on *In re C–TC 9th Ave. P'ship,* 113 F.3d 1304, 1310 (2d Cir.1997) and *In re Cohoes Indus. Terminal, Inc.,* 931 F.2d 222, 227–28 (2d Cir.1991)); *accord In re St. Stephen's 350 East 116th St.,* 313 B.R. 161, 170–71 (Bankr.S.D.N.Y. 2004). *Contrast In re Silberkraus,* 253 B.R. 890, 913–14 (Bankr.C.D.Cal.2000) (finding no basis in the text of 11 U.S.C. § 105(a), in Rule 9011, or in the controlling case law of inherent powers requiring clear and convincing evidence rather than preponderance of the evidence, i.e., the "normal standard of proof in civil matters," before imposing sanctions). *See also Shepherd v. Am. Broadcasting Compa-*

*nies,* 62 F.3d 1469, 1478 (D.C.Cir.1995); *Samuel v. Michaud,* 980 F.Supp. 1381, 1408–09 (D.Idaho 1996).

### Sanctions for Ms. Schwartz and S & D.

■ Sanctions are provided for in Rule 9011(c). As already indicated, Ms. Schwartz has violated Rule 9011(b)(1) and (3) by filing a writing in the *Rivera* case (i) for an improper purpose, i.e., to have the court believe that the writing was a validly reviewed and executed certification, and (ii) which states facts as to Amirah Shahied being the signatory (and presumably the reviewer of the final form of document), which are blatant falsehoods. Ms. Schwartz has filed this document in her capacity as an attorney with S & D, making Ms. Schwartz and S & D jointly responsible for the Rule 9011 violations. S & D's longtime practice of filing such documents (known to and overseen by Ms. Schwartz as principal bankruptcy attorney) calls for substantial sanctions beyond those assessable in the *Rivera* case.

■ Sanctions in this case should be imposed to deter future abuses. They should send a clear message to these respondents and to those similarly situated to Ms. Schwartz and S & D that the certification process—including review of final documents and contemporaneous execution of same—must be adhered to diligently. Yet the sanctions should be the least severe punishment that will deter these and similar abuses in stay relief applications. *Doering v. Union County Bd. of Chosen Freeholders,* 857 F.2d 191, 194–95 (3d Cir.1988) (the amount of sanction under Rule 11 should be the minimum necessary to deter the undesirable conduct; the purpose of these sanctions is not to shift fees or to drive the attorney out of practice, the latter falling under the purview of the disciplinary authority). *Accord*

tifiable responsible person requirements as they apply to stay relief applications.

*White v. Gen. Motors Corp.*, 908 F.2d 675, 684–85 (10th Cir.1990) (the goal of Rule 11 sanctions is "optimal rather than maximum deterrence"). *See generally, Navarro–Ayala v. Nunez*, 968 F.2d 1421, 1426–27 (1st Cir.1992) (the court of review "should defer, within broad limits, to the [lower] court's exercise of its informed discretion" in establishing Rule 11 sanctions); *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 394 (1st Cir.1990) ("the Civil Rules place virtually no limits on judicial creativity" in designing a Rule 11 sanction so long as it is "appropriate," that is, that it meets the twin goals of deterrence and compensation). As to the measure of penalty amounts *see, e.g., In re Brown*, 152 B.R. 563, 569 (Bankr.E.D.Ark.1993) (after considering "whether the sanction is the least severe that will deter undesirable conduct," the court levied a sanction of $500 to deter duplicative filing and to compensate the offended creditor); *In re 1095 Commonwealth Corp.*, 236 B.R. 530 (D.Mass. 1999) (sustaining a sanction of $142,520 measured on counsel fees because the " 'reasonable costs' incurred" in responding to a pleading which violated Rule 9011 "may appropriately form the basis of a Rule 9011 sanction").

This court will (i) impose monetary sanctions upon Ms. Schwartz and the firm, (ii) will enjoin future abusive practices (as more fully described *infra*), and (iii) will refer Ms. Schwartz and S & D to the Chief Judge of this District pursuant to L. Civ. R. 104.1(e)(2) for further investigation and potential disciplinary action for violation of the Rules of Professional Conduct (again, as more fully described *infra*).

■ For Ms. Schwartz's role in the *Rivera* case, the court levies a fine of $500 for that single act. This amount is in the range of ordinary fines and penalties for more isolated and less egregious infractions in the face of bankruptcy courts (e.g.,

simple stay relief violations, errant discovery tactics, etc.) and less than the routine S & D charges for processing stay lift applications (as indicated to this court by S & D's counsel). This penalty is quite modest, partly because the court recognizes that Ms. Schwartz's compensation is at or near the bottom of the pay scale for experienced attorneys in this district, and partly because her jeopardy as to discipline is far from over.

■ S & D as a firm must suffer a substantial fine in order for this court's point to be made effectively and for deterrence to be reasonably assured. S & D's filings after the departure of Amirah Shahied are the clearest examples of its abusive certification practice; for the roughly 250 such filings, the court will impose a $125,000 penalty (again, $500 per incident). The years of wrongful filings could well have justified a fine of many times this amount, but this court is mindful of the law's caution to keep such penalties to the minimum necessary to meet the purposes of Rule 9011.

. The court notes the involvement of court personnel, facilities and calendar time involved in bringing this immediate matter to conclusion. The systemwide cost of all of this, plus the considerable involvement of the Office of the United States Trustee is a significant public expenditure. All of this was prompted by the blithe implementation of a renegade practice—the use of presigned forms in lieu of contemporaneous review and execution of certification.

### Disposition of Orders to Show Cause as to Other Respondents.

Respondents (i.e., those subject to this court's Order to Show Cause and injunction set forth in the October 24, 2005 Order) include: S & D, EverHome, Shapiro, Kreisman, Diaz, Schwartz, Shapiro & Kreisman, LLC, and FANDO. Respon-

dents other than Schwartz and S & D each have had their conduct in connection with the S & D Certification Practice scrutinized, with the court's conclusions as hereinafter described.

### 1. *Diaz.*

 Mr. Diaz, as the managing attorney of S & D, bears responsibility for what happened at the firm "on his watch." While he was not involved directly with bankruptcy processing, it is apparent that he knew of the warehousing of presigned forms and their use in court filings. In fact, Mr. Diaz in his bailiwick, state court foreclosure actions, deviated from the norm and fell in line with the use of on-file signature pages in foreclosures. For that specific activity, apparently ongoing for years, and any role he has played in oversight of the bankruptcy practice, this court will refer Mr. Diaz to a further ethics inquiry (as elaborated on, *infra*). The court finds no need to attempt application of Rule 9011 to Mr. Diaz (a nonfiler here in technical terms), or to utilize its other powers to sanction him. The injunction against involvement in abusive processes, however, shall be applied to Mr. Diaz. And, it is evident that the fine levied against S & D will have economic impact on Mr. Diaz as the managing attorney of S & D.

This court notes with dismay that Mr. Diaz was in a position to speak out against the S & D Certification Practice (if not stop it entirely), is a seasoned practitioner (approaching twenty years in practice), and yet he yielded to the use of presigned forms.

### 2. *Shapiro, Kreisman and Shapiro & Kreisman, LLC.*

 Messrs. Shapiro and Kreisman disclaimed any knowledge of the use of presigned forms at the New Jersey office, or, more generally, the violation of any rules of the bankruptcy court here. The court has no reason to doubt their disclaimer (which was verified by Mr. Diaz).

Having had an early and rather clear view of the future of mortgage loan servicing, these attorneys initiated a niche industry. LOGS and the S & K network of law firms were the result. They marketed their speed and efficiency in handling high volume, diverse state foreclosures.

Efficiency in processing is not necessarily antithetical to deliberate and cautious judicial review of residential foreclosure action. But pressures to speed up the foreclosure process (and related bankruptcy relief) can, if unchecked, overcome important safeguards. The family residence remains the backbone of the American economy—it is still a goal for those who would strive, and the most valuable and enduring asset for those who have achieved a financial foothold. "E-foreclosure" is not accepted public policy, and should not intrigue even those who would hawk bonds securitized by bundles of home mortgages. In fact, foreclosure is a cost to both the foreclosing party and the homeowner. At least while home values have been escalating, good business sense has dictated that mortgagors be given multiple chances to cure defaults (as with Ms. Rivera).[32] As mortgage defaults increase (and particularly if real estate values remain flat or decline) there should be heightened concern for process issues.

The Shapiro and Kreisman back-office blitz in bankruptcy (to free up foreclosures) turned S & D, the captive law firm, into an unprofessional appendage to LOGS

---

**32.** Forward thinking mortgagees and servicers have begun to open more direct lines of communication to discuss cure alternatives to foreclosure where feasible. The institutionalization of "hot lines" for this purpose should be encouraged.

(and later, FANDO). Sadly, under the pressure to produce, Ms. Schwartz and Mr. Diaz seem to have lost sight of their professional responsibility. This loss was facilitated because Messrs. Shapiro and Kreisman did not care to establish quality controls to assure that professional standards were being maintained. Time of processing paper was the highest value.

This court will not extend Rule 9011 sanctions or other sanctions to these Illinois attorneys or their LLC; the monetary sanction imposed on S & D should flow upstream sufficiently to make the court's point. Hopefully, Shapiro and Kreisman will exercise their considerable influence—through their nationwide network of law firms—to oversee and upgrade where necessary the professionalism of the attorneys they control. This court's application of the injunction (described *infra*) to Messrs. Shapiro and Kreisman is an admonition in this regard.

### 3. *FANDO.*

■ FANDO's participation with S & D (and thus in the S & D Certification Practice) began with its purchase of LOGS in June or July 2004. Mr. Zakula made the transition from LOGS to FANDO. He readily acknowledged the New Jersey requirement for certifications to support stay relief applications. Moreover, FANDO had an established procedure for obtaining such documents, a procedure which was part of a handbook distributed to local counsel including S & D.

Something did not work in the process. This court believes that, under its inherent powers (and perhaps Rule 9011) FANDO's conduct could be the subject of sanctions.[33] However, FANDO was quick to engage in an internal investigation and provide assurances that the rules of this court will be honored. That assurance, as well as the application of the court's injunction to FANDO, should suffice in these circumstances.

### 4. *EverHome.*

■ EverHome, as the "client," has jeopardy under Rule 9011 for the filings by S & D in the *Rivera* case. However, it is clear that EverHome relied fully on FANDO and S & D. Moreover, the proofs show that EverHome was only the named secured party in the *Rivera* stay relief application and one other matter, among the 251 "Amirah Shahied" writings filed by S & D after Ms. Shahied had left LOGS/FANDO. No monetary sanction will be issued as to EverHome. Application of this court's injunction to EverHome should provide sufficient notice—indeed, warning—that future involvement in such practices will not be tolerated.

### *Injunction and Admonition.*

In its October 24, 2005 Order, the court issued the following injunction:

---

**33.** *See, e.g., In re Rainbow Magazine, Inc.,* 77 F.3d 278, 282 and 285 (9th Cir.1996) (upholding sanctions against the debtor's principal under Rule 9011 for signing a false Statement of Financial Affairs *and* under the court's inherent powers for his general bad faith conduct in orchestrating the bankruptcy filing and then subverting the control of the Chapter 7 trustee) (relying on *Lockary v. Kayfetz,* 974 F.2d 1166, 1170 (9th Cir.1992) (superceded by statute on other grounds), *cert. den.,* 508 U.S. 931, 113 S.Ct. 2397, 124 L.Ed.2d 298 (1993)). *See also In re Kujawa,* 256 B.R. 598, 611–13 (8th Cir. BAP 2000), *aff'd in part, rev'd in part and remanded,* 270 F.3d 578, 581–82 (8th Cir.2001). Relying *solely* on Rule 9011, *see, e.g., In re Start the Engines, Inc.,* 219 B.R. 264, 270–71 (Bankr.C.D.Cal.1998); *In re Creditors Serv. Corp.,* 207 B.R. 567, 570 and 574 (Bankr.S.D.Ohio 1997); *Midwest Properties No. Two v. Big Hill Inv. Co.,* 93 B.R. 357, 361–62 (N.D.Tex.1988). Relying *solely* on inherent powers, *see, e.g., In re Mroz,* 65 F.3d 1567, 1576 (11th Cir.1995); *In re Kliegl Bros. Universal Elec. Stage Lighting Co.,* 238 B.R. 531, 550 (Bankr.E.D.N.Y.1999).

ORDERED that S & D, Nelson Diaz, Esq., Rhondi L. Schwartz, Esq., Gerald Shapiro, Esq., David Kreisman, Esq., Shapiro & Kreisman, LLC, and any law firms controlled by Gerald Shapiro, Esq. and/or David Kreisman, Esq., shall be enjoined from engaging in this District in the S & D Certification Practice (that is, to revert to their prior practice of using a presigned certifying paragraph, and of not having the signatory to the supporting certification both review the full and final form of certification and execute that certification contemporaneously with that review, all prior to the filing of such certification with the Court), and further, from submitting supporting documentation to the Bankruptcy Court in this District for purposes of obtaining relief from the stay so that foreclosure proceedings might be initiated and/or continued, which violate the Federal Rules of Bankruptcy Procedure, and the Local Rules, Administrative and General Orders of the Bankruptcy Court of this District....

(Docket entry 50.) S & D had already changed its practice following the Order of September 12, 2005. Nevertheless, that injunction was warranted because the pressures to take shortcuts in process remain and because the requirement that certifications be reviewed by the signatory contemporaneously with execution (previously considered an "of course" proposition by the court and, presumably, the practicing bar), apparently needed articulation.

▮ Certifications supporting stay relief applications should be reviewed and executed contemporaneously; as indicated throughout this opinion, the signatory should be a *responsible party* (i.e., one with access to data and records who is assigned the task of verifying same by the secured party-client).[34] That responsible party must understand the significance of his/her signature. Unsworn declarations should be dated and be in substantially the following form: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct...." 28 U.S.C. § 1746.

Apparently, high volume production-oriented law firms, their clients (e.g., EverHome), and intermediaries (e.g., FANDO and LOGS), need reminding of the solemnity of the undertaking to declare facts to be "true and correct." Given the disclosures made in this case,[35] the court will exercise its inherent powers and extend the injunction, as a final order, to all respondents. *Fellheimer*, 57 F.3d at 1224 (federal courts have "inherent power to control the conduct of those who appear before them"), referring to *Chambers*, 501 U.S. at 43, 111 S.Ct. 2123 ("It has long been understood that '[c]ertain implied powers must necessarily result to our courts of justice from the nature of their institution,' powers 'which cannot be dispensed within a court, because they are

---

34. The court recognizes that there are occasions when counsel has first-hand knowledge of events pertinent to stay relief applications (as with statements in court, references to filed documents, or in circumstances when payments are made through the attorney's office); in such limited instances an attorney's certification is acceptable.

35. Of course, S & D has operated beyond the pale. Shapiro and Kreisman have failed in their oversight of S & D. Their enterprise,

LOGS, had personnel who instructed Amirah Shahied to presign the would-be certifying statements. As to other parties, respondent FANDO, knowing through Mr. Zakula of the New Jersey requirement for certifications, did not seem inclined to inquire how stay relief was being obtained without S & D knocking on their door for signed documentation; and EverHome seemed to be satisfied to leave it to the hired-on back office operator, FANDO, to deal with "the details."

necessary to the exercise of all others'" (internal citations omitted)). This inherent power is vindicated by the court's discretion "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers,* 501 U.S. at 44–45, 111 S.Ct. 2123. In addition, the separate authority of the bankruptcy court under 11 U.S.C. § 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" gives the court attendant injunctive powers.

Mortgage-secured parties, their servicers and subservicers, and attorneys, are admonished that in this district stay relief applications to advance foreclosures (and particularly residential real estate foreclosures) must comply with local rules. Nothing less than such compliance, diligent inquiry and accurate accounting will be accepted. Future lapses in process will be dealt with accordingly.

### Ethics Referral.

The court is constrained to refer the conduct of Ms. Schwartz, Mr. Diaz and S & D to the Chief Judge of this district for further review and ethics disciplinary proceedings. L.Civ. R. 104.1(e)(2). The Rules of Professional Conduct ("RPC") adopted by the New Jersey Supreme Court "govern the conduct of the members of the bar" practicing in the bankruptcy courts of this district. *See* L. Civ. 103.1(a) and D.N.J. LBR 1001–1(a).

Use of presigned certification forms by Ms. Schwartz, Mr. Diaz and S & D implicates RPC 3.3 ("Candor Toward the Tribunal"), which bars the knowing submission to a court of a false material fact or an offer of evidence known to be false.

Whether lawyers at S & D have sacrificed their professional independence is also of serious concern. RPC 5.4(d)(3); *see also* RPC 1.4(d) and 2.1. And, the S & D Certification Practice raises serious questions about the supervision of nonlawyer assistants.[36] Of course, in the ethics process Ms. Schwartz, Mr. Diaz and S & D are free to stress factors in mitigation of discipline (including, to the extent reflected in their actual practice, efforts to report only accurate data and their role in facilitating home-saving results).

The court depends on the ethical and professional conduct of attorneys. As volume increases, judicial processes and participants are subjected to certain pressures. Electronic filing and retrieval are necessary court aids, but dependable, ethical performance by lawyers remains indispensable. Lawyers must maintain their independence—and resist, at the risk of losing a client or their employment, pressures which would undercut their professionalism.

### Conclusion.

The Rivera payment issues are resolved by a consent cure order. Therefore, no stay relief is warranted. An order shall be issued, permanently enjoining the S & D Certification Practice in this district and participation in practices violating court rules by many of the respondents cited in the court's Orders to Show Cause.

Ms. Schwartz shall be fined $500 and S & D shall be fined $125,000 for their Rule 9011 violations, and the conduct of Ms. Schwartz, Mr. Diaz and S & D shall be referred to the Chief Judge under the applicable disciplinary rules.

---

**36.** In a statement that is at best myopic, Ms. Schwartz identified S & D's young paralegal's use of *photocopied* "Amirah Shahied" signature forms as regrettable. Docket entry 75 ¶ 11. The training and supervision of that paralegal is a lawyer's responsibility, as is the need to understand the bigger picture, i.e., the gravity of using presigned forms (in an original "ink" state or otherwise).

The court will issue its implementing order.